[Civ. No. 17836.   First Dist., Div. One.   Dec. 23, 1958.]

JOSEPH DICKSON SINCLAIR et al., Appellants, v.
SARAH FRANCES WEBER, Respondent.

Kaiser & O'Neill, Jeremiah F. O'Neill, Jr., Robert A. Kaiser, Smith & Smith, Melvin M. Belli and Caroline Rose for Appellants.

Augustin Donovan for Respondent.

BRAY, J.—Plaintiffs appeal from an adverse judgment, without jury trial, in an action to set aside a deed and to establish a trust, based upon four counts: (1) nondelivery of the deed; (2) unsoundness of mind of grantor; (3) undue influence of grantee; (4) that grantee holds certain property in trust pursuant to agreement.

### CONTENTIONS

1. That the findings that the actions of the grantor were free and voluntary and not the result of the undue influence of the grantee are not supported because a presumption of undue influence arose which was not rebutted.

2. That the agreement is a trust agreement and upon the death of the beneficiary the corpus reverted to the grantor's estate.

### GENERAL FACTS

The grantor, Miss Sarah Sinclair, who lived alone, employed defendant in July, 1948, as companion and housekeeper. This employment continued until the death of Miss Sinclair, May 16, 1954. Plaintiffs are first cousins of Miss Sinclair. Apparently none of them were acquainted with her, except that Miss Sinclair had on occasion sent Christmas gifts to plaintiff E. J. Sinclair in Ireland. Other than that, Miss Sinclair, during her lifetime, had no contact with her blood relatives. Miss Sinclair owned real and personal property including securities, bank and savings accounts of approximately $625,000. At her death she had left only $30,000 in a joint tenancy account with defendant. Defendant as executrix of her estate filed an inventory valuing the property in the estate at $15. All the rest of it Miss Sinclair had given defendant over the years. Starting in 1949 Miss Sinclair began making a series of wills favorable to defendant. During the years Miss Sinclair had several attorneys and many wills, some of which were holographic.* In 1952 and thereafter the wills left the bulk of her estate to defendant. Finally they left practically all to defendant. In September, 1949, Miss Sinclair deeded her home to defendant, and from time to time placed moneys in the bank and savings and loan association in joint tenancy with defendant. In October, 1952, she and defendant entered into the agreement hereafter discussed. By the middle of 1953 the bulk of Miss

---

*In no will did Miss Sinclair leave any money or property to any of the plaintiffs. In various wills she left sums up to $5,000 to her sister-in-law Della. In the last will she left Della $50.

Sinclair's property, consisting of cash and securities, had been transferred to the sole name of defendant.

### 1. *Undue Influence.*[*]

The court found that Miss Sinclair "had great trust and confidence in and affection for" defendant and that defendant did not take advantage of said trust or confidence and did not make any effort to control Miss Sinclair's disposition of any property.

An examination of the transcript shows that the evidence is conflicting and while there was evidence from which the court could have found undue influence, nevertheless the evidence sufficiently supports the court's finding and was sufficient to overcome the presumption of undue influence arising from the confidential relationship between Miss Sinclair and defendant.

Prior to the employment of defendant, Miss Sinclair had a number of friends who it is claimed were gradually thereafter denied access to Miss Sinclair. Attorney R. H. Cross, a schoolmate, had drawn wills for Miss Sinclair in 1927 and in 1949. He also visited her many times as a friend. In her holographic will dated December 5, 1949, and a formal one drawn by him on December 19, 1949, he was bequeathed as a friend 200 shares of Transamerica stock. (Attorney Potstada testified that the latter will gave Mr. Cross all of her Transamerica stock (2,224 shares) and all of her Bank of America stock (1,854 shares).) This will made defendant the residuary legatee. Miss Sinclair had discussed with Mr. Cross deeding her property to defendant, but on his advice, she decided to let the property go to defendant under the residuary clause. In November, 1952, Miss Sinclair wrote Attorney Cross asking him to return this will. On taking the will to her home defendant informed him that Miss Sinclair "sees no one," "her face is all gone." He gave the will to defendant who evidenced "great satisfaction and glee." For a year prior to that time he had phoned the Sinclair residence many times but each time had been informed by defendant that Miss Sinclair was not available.

Miss C. J. M. Jones attended college with Miss Sinclair. They were close friends. On Christmas Eve, 1951, she went to Miss Sinclair's to give her a gift. Receiving no answer at the front door, Miss Jones went to the door of the kitchen

---

[*]Plaintiffs do not contest the court's findings that Miss Sinclair was of sound mind and that the deed was delivered.

where she saw a light. Upon calling Miss Sinclair's name the light went out. Arriving home she phoned Miss Sinclair, who said that hereafter Miss Jones should send things by mail. Thereafter when she phoned, Mrs. Weber would advise her that Miss Sinclair was resting, or out in the garden, or had some other excuse why Miss Sinclair could not speak to her.

Mrs. Emma Gibson's story was similar to that of Miss Jones. Mrs. Gibson had known and visited Miss Sinclair for years. But after defendant arrived defendant would tell her that Miss Sinclair was not well enough to come to the phone. She visited Miss Sinclair after the latter's operation in 1952 and they had a good visit, nothing out of the ordinary occurring. Miss Sinclair was happy to see her.

Mr. Jules Piccardo knew Miss Sinclair since 1936 and had acted as her banker. He had visited her socially and had entertained her in his home. He knew Miss Sinclair's sister-in-law Della and the relationship between Miss Sinclair and Della was very good. Miss Sinclair was very frugal and conservative. He and she had exchanged Christmas presents up to the last couple of years before her death.

Mr. Ralph Knapp, a realtor, knew Miss Sinclair since around 1914, both socially and through business. They exchanged Christmas cards up until the last three or four years. While he had been accustomed to stop in and see Miss Sinclair when he was in her neighborhood, he could not get in to see her in the last three or four years as defendant answered the door and would state that Miss Sinclair was not at home or give some such answer. He met her on the street while she was on the way to the doctor and she acted the same as ever toward him. Although she had aged considerably she was her own cheerful self. Although at other times he had been at her home when she was sick in bed, it struck him "very funny that every time I made a trip there she was not available."

Mr. Perry Spann, a retired contracting painter, had worked for Miss Sinclair from 1914 to 1951, doing all the painting work on her residence. In 1952 he stopped several times to see her when she was ill, but defendant would tell him that Miss Sinclair was upstairs, or resting, or did not feel like meeting anyone at present. On one occasion when defendant came to the door, Miss Sinclair was sitting in the hallway, and asked if that was Mr. Spann, and said, "Will you please have him come in?" She talked rationally, seemed to be

evading something, and did not seem to be herself. He felt that she did not want him there. He never got in again.

Dr. Goodwin specialized in women's gereology and gynecology. Miss Sinclair was her patient from August, 1939, to February, 1952, seeing her once a week during that period. A great friendship arose between them and in the visits she made Miss Sinclair they would visit socially from 40 to 50 minutes. In addition they visited on the phone. In April, 1951, Miss Sinclair complained of pain in her face and cheek. She was referred to Dr. Lewis Morrison, a specialist. He made smears which were negative for malignancy, and advised Miss Sinclair to see him once a month, which she did for two or three times. Dr. Goodwin asked her if she was following through with the Morrison treatments. She stated that she was not because it cost $7.50 a visit and she did not feel that she could spend that and that defendant felt that it was too much. Dr. Goodwin, as time went on, advised Miss Sinclair that there was a thickening of the bone in her face to which Miss Sinclair replied that defendant said that it was just the same and was not getting any larger. Miss Sinclair did not go to Dr. Morrison about it. In June, 1951, Miss Sinclair came to Dr. Goodwin's office complaining about her mouth. Dr. Goodwin found a mass protruding through the upper part of her hard palate and took Miss Sinclair to Dr. Morrison, who told Miss Sinclair that she must have surgery at once. Miss Sinclair stated that she would not make a decision until she discussed the matter with defendant. Later Miss Sinclair phoned that defendant said that it was all right to go ahead with the surgery. Dr. Goodwin asked Miss Sinclair at the hospital if she liked the room she was in. Miss Sinclair said that defendant "had inspected the room, and said she guessed it would do." Both Dr. Goodwin and Dr. Morrison advised Miss Sinclair that if she did not receive X-ray treatment the malignancy would spread faster. Miss Sinclair left the hospital February 9, 1952, and was to report February 12 for X-ray treatment. On February 11 a phone call had been left for Dr. Goodwin from Miss Sinclair asking to change the appointment. Dr. Goodwin phoned Miss Sinclair but defendant stated that Miss Sinclair had her plate out and could not talk. Dr. Goodwin had previously talked to Miss Sinclair on several occasions when the latter had her plate out. Miss Sinclair indicated to Dr. Goodwin that defendant discussed with her things of a personal nature so far as her household was concerned, and had control of things going on in the household. Defendant

arranged for the painting of the house inside and out, installation of a sprinkling system, new fences, new stove, removal of a palm tree, employment of somebody to assist defendant in the house, and the purchase of other items for the house. Miss Sinclair told Dr. Goodwin that she would like to listen to Fulton Lewis, Jr., on the radio, but that she did not dare as defendant "was a New Dealer and would not countenance having her listen to the program." Dr. Goodwin prescribed for Miss Sinclair a tonic that included a tablespoon of sherry wine. Miss Sinclair told the doctor that defendant "would have a fit if she knew she had any sherry." After February, 1952, Dr. Goodwin wrote several letters to Miss Sinclair, telephoned the house unsuccessfully as defendant would state that Miss Sinclair was out or resting. Miss Sinclair was frugal and thrifty, even to the extent that she wore darned stockings. Prior to 1952 Dr. Goodwin and Miss Sinclair exchanged Christmas gifts but thereafter the doctor never heard from her.

On October 9, 1952, Miss Sinclair and defendant went to the office of Attorney Kindig where Miss Sinclair executed a will in which, after making a number of bequests to friends in sums from $50 to $500 and $50 to her sister-in-law Della Sinclair, she bequeathed the residue of her estate to defendant.

Attorney Kindig testified that Miss Sinclair wanted to take care of defendant if defendant would take care of her as long as she lived, that she had already made out the deed to the real property but had not as yet delivered it, that she wanted to protect defendant if there was anything left after her operation and disability, and that she wanted to open joint bank accounts with defendant and to transfer to defendant all her securities. Miss Sinclair also wanted him to serve as her attorney for the rest of her life to look after her interests and estate and wanted him to share in her estate. He told Miss Sinclair that she should be protected as she might need the money later on. She told him to prepare the necessary documents. He then prepared cross-deeds for the real property, and wills for both Miss Sinclair and defendant. Defendant's will left all of her estate to Miss Sinclair. The latter's will left her residuary estate to defendant. Kindig also prepared and the parties signed the agreement hereafter discussed.

Two days later, October 11, a most peculiar agreement was entered into between defendant and Attorney Kindig. In it defendant retained him "to represent her as her attorney at law in a cause of action . . . regarding the estate of Sarah Sinclair and agrees to pay him for his services 50% if no

contest of will. 50% if there be a contest of will.'' Kindig testified that defendant came to his office and stated that Miss Sinclair had instructed her to come in and wanted him to draw an agreement with the terms as embodied in the last-mentioned agreement. A few days thereafter defendant returned to his office, saying ''I have proven unfaithful to Miss Sinclair,'' and asked that the agreement be destroyed. He destroyed it.

In November Miss Sinclair wrote Kindig a letter terminating his services. However, she engaged him again the next month. In April, 1954, he discussed with defendant the alleged trust agreement. She told him it was none of his business, as his retention had been terminated. She said, ''I have put her where I want her to be, where she should be,'' and ''The property is mine, I can do as I please.'' Kindig had a claim for services of over $11,000 for services from September, 1952, to the date of her death.

October 11, 1952, Miss Sinclair wrote a ''Last Will and Testament,'' addressed ''To Whom It May Concern.'' Besides stating that Kindig had her securities (for transfer to her and defendant as joint tenants) which he was to return, she gave her home, all moneys and ''all and sundry in my possession'' to defendant. May 18, 1953, she executed a holographic codicil to her formal will of October 9, 1952. She ratified the former will except that she deleted a small money gift to Charlotte Jones and substituted Attorney Potstada for Kindig as alternate executor. She also wrote, ''I do hereby declare that I have previously given and transferred freely and voluntarily certain stocks and other securities to Sarah Frances Weber, which transfer I hereby confirm.''

In February, 1952, prior to the retention of Kindig, Miss Sinclair had engaged Attorney Rode to prepare a will. She had noted on the copy of a prior will the changes she wanted to make. She said she had already disposed of her real property as a gift. Defendant and Miss Sinclair came to his office after he had prepared the will. He asked defendant to leave. Then Miss Sinclair read the proposed will. He and his brother witnessed it. She appeared to be a woman of intelligence, of sound mind and competent to dispose of her estate. She was very definite in her desire to have defendant as the residuary legatee. The will, dated March 3, 1952, after certain small specific bequests, bequeathed the residue to defendant absolutely. October 6, 1952, Rode saw Miss Sinclair at her home. She was concerned as to whether substantially all of her estate would go to defendant under the will. She

stated that she had given a deed to her home to defendant unequivocally and without reservation. She also was concerned over interference with her affairs by Della (the sister-in-law). She stated that Della had Cross call at her home to see her and she was indignant about it. She wanted to eliminate Della as a legatee. Defendant urged her to let it stand. Miss Sinclair asked whether anyone could contest the will as defendant would rather not take anything than have trouble over it. She was dissatisfied with Dr. Morrison, who had upset her considerably by his manner and use of coarse language. This dissatisfaction was aggravated by Dr. Goodwin who merely passed off her complaint with ''that is just his way.''

In January or early February, 1953, Attorney Potstada became the attorney for Miss Sinclair. He estimated the value of her properties then to be around $600,000 to $700,000. She told him that she wanted to transfer her securities outright to defendant, not in trust or joint tenancy, as they had been put by Mr. Kindig. She said that she had employed Attorney Kindig to transfer her properties to defendant but instead he transferred them in joint tenancy and subsequently refused to take them out of joint tenancy. She wanted Potstada to draw a new will to replace the one in which she left stock to Mr. Cross. Miss Sinclair feared that Della or Mr. Cross would get their hands on her property. Potstada arranged the transfer of the bulk of her securities to defendant because of that fear. Miss Sinclair considered defendant as her sister and the closest person to her. The bulk of her securities was transferred to defendant by July, 1953. Miss Sinclair left the Kindig will for minor changes. She said she would retain all the old wills. Potstada told her it was a good idea as further security, as all of the wills would have to be broken separately should the *inter vivos* transfers be overturned. With the view that there might be a contest of the will, Potstada had two other lawyers act as witnesses. In that will defendant was again named residuary legatee. Miss Sinclair paid him $5,000 for his services and a gift of 100 shares of Transamerica. Potstada had many conferences with Miss Sinclair in which she told him of her desire to transfer all her assets to defendant. Defendant was not present on most of these occasions. Miss Sinclair was ''a very shrewd, intelligent and financially capable woman, and knew what she wanted to do.'' Prior to the death of Miss Sinclair he had never represented defendant. After Miss Sinclair's death defendant gave to

Attorney Potstada federal bonds of approximately $40,000 value which defendant had received from Miss Sinclair.

Attorney Potstada testified that the services rendered defendant by him for which the $40,000 was paid, included representing her for a time in this particular action and also in the lawsuit brought against her by Attorney Kindig on the above mentioned agreement. He testified that in resisting a proceeding brought by Attorney Kindig to have a guardian appointed for Miss Sinclair on the ground that she was incompetent, he was acting for both Miss Sinclair and defendant.

The two lawyers who witnessed the will testified that Potstada had asked them to be particularly observant of Miss Sinclair since a contest was expected. One of them testified that he understood that the property had already been transferred and the will was a precautionary measure. Miss Sinclair seemed to be a "sharp little old lady."

As to the Kindig agreement, defendant testified that because of the condition of her eyesight she does not read and that it was not read to her. As stated above, Attorney Kindig testified that in a few days after its execution defendant came to him and demanded that the agreement be torn up.

In September, 1949, Miss Sinclair executed the deed of the home to defendant, handed it to her stating that it was a gift. Defendant kept the deed until 1953. In January of that year, upon the advice of Miss Sinclair, she gave it to Attorney Kindig to record. At that time defendant executed a deed back to Miss Sinclair and a will leaving everything to the latter. Kindig told defendant to keep them and that they were to protect Miss Sinclair in the event something happened to defendant. The same day, on Kindig's advice, since Miss Sinclair wanted to be sure that defendant got the money, defendant withdrew $47,200 from various joint accounts and put the money solely in her own name. In the same year all of the bank accounts, stocks and bonds were transferred to defendant, as Kindig had advised Miss Sinclair to do this since she was afraid someone would get her property even though she was leaving everything to defendant. After the operation in October, 1952, Miss Sinclair could not wear her false teeth and could not talk as the scar was still sore. She did not want to see anyone because of the disfigurement. Prior to the operation Emma Gibson had come to the house and on seeing the tumor on Miss Sinclair's cheek exclaimed, "Oh, Sarah, what has happened to you? How horrible you look!" She then turned and walked away. Miss Sinclair

said, "Well, I must be a sight." After that Miss Sinclair did not want to see her friends, saying she was disfigured and could not talk. As to the telephone calls, defendant would ask Miss Sinclair if she wanted to talk. Miss Sinclair would always say she did not and could not because she did not have any teeth. In the summer of 1953 Cross told defendant that he had a letter from Della, and that Della was the proper one to take care of Miss Sinclair. He said that if defendant wanted to do it he would arrange for it. Defendant said she was not interested. When he left, Miss Sinclair who had heard the conversation said, "Such greed I have never heard of."

Dr. Presant saw Miss Sinclair professionally October 6, 1952. He referred her to Dr. Berkove for treatment. Her only concern at that time was whether defendant could visit her at the hospital. She was mentally alert, very intelligent, and a woman who would have her own way, very sweet but insistent that things be done as she wanted. Dr. Berkove removed a malignant tumor by cutting her cheek from the corner of the eye to the lip. He saw her daily from October 13 to 23, 1952, and thereafter until she went to the sanitarium, where he advised her to go. She impressed him as being very resourceful and mentally alert. On January 21, 1954, she, for the first time, showed memory loss by repeating several questions. Defendant said she also noticed this.

Tosh and Susumi Mitoma, brothers, came to Miss Sinclair's home once a week from 1947 until her death to do gardening. They arrived about 10:30 a. m. and remained until the middle of the afternoon. They usually spent about an hour after lunch talking to Miss Sinclair. Tosh testified that on one occasion she stated that she was going to will the home to defendant. Later she said she had done that and after 1952 she stated that she was turning the property and everything over to defendant, that she was giving defendant "The property, the house, and her business." Her business so far as the witness knew was "stocks." She said she did not have any relatives after her brother died and that defendant had been faithful to her. The relationship between defendant and Miss Sinclair was very congenial. "They were always going out together, more like sisters." Susumi, a graduate of the University of California in entomology, testified that he had "never met a sharper woman, more intelligent and capable in every way." Defendant and Miss Sinclair "seemed to hit it right off together and they became quite attached to one another. They seemed to complement each other in their

personalities.'' ''They always seemed to get along more like sisters than anything else.'' On one occasion Miss Sinclair told Tosh that she had turned over the house to defendant. ''They were very happy, used to be quite a bit together, and laugh and joke all the time.'' Miss Sinclair did not like to meet people because of her scar as she was sensitive about it.

On March 22, 1953, Miss Sinclair wrote a very interesting four page statement in her own handwriting. The same day she sent to Attorney Potstada a copy of it which she also wrote out in longhand. In it she states why she has transferred and is transferring to defendant her stocks, bonds and savings account instead of placing them in trust or having them distributed under her will. She is fearful that Attorney Cross and her sister-in-law Della Sinclair, because of incidents which she relates, because of the fact that Attorney Cross is in correspondence with Della, and because of their solicitude for her health, were ''planning a future for me, which would be most hateful to me and to which I shall not yield,—with God's help.'' She refers to the fact that Della had once sent her a gift of $10,000 but that when she learned from Della's ''constant orders regulating my life'' that Della ''felt her gift to me, gave her the right to dominate my life'' she returned the money. She also explains that Attorney Kindig had held back some of her securities when she had asked him for all of them and that she felt, upon reviewing, that the agreement she had entered into with him was ''out of order . . . very unreasonable.'' Hence she had discharged him as her attorney. She ends the statement: ''I would much prefer—as I have done and am doing now, to transfer these matters to my friend and constant companion, and to deliver them to her while I am still here, as it gives me faith to know that my wishes shall be consummated. I trust she will be spared to enjoy *all she gets—if she get it! Heaven knows,— I don't!*''

She also wrote a note in which she stated that in April, 1953, she had given certain unnamed securities to defendant. Still another note stated that she did not want Kindig to act in any capacity as attorney for her or her estate, and ''I, Sarah Sinclair, give, transfer and assign all of my negotiable bonds on this date [May 5, 1953] to Sarah Frances Weber as her own separate property without any conditions or reservations. I further acknowledge the actual delivery of these bonds by this instrument and all the interest I have therein.''

Subsequent to the Potstada drawn will Miss Sinclair executed another holographic will, probably by copying a prior formal will. In it, after certain small gifts, she left the residue to defendant.

■ "Where the burden shifts to the defendant to show fairness and good faith in the transaction as it does under the facts in this case, it is nevertheless incumbent upon the appellant in order to prevail upon the appeal to show that no credible evidence was produced from which the reasonable inference might be drawn that the grantor acted voluntarily and with full knowledge of the facts and a complete understanding of the effect of the transaction." (*O'Neill* v. *Dennis* (1952), 109 Cal.App.2d 210, 212 [240 P.2d 376]. There the trial court had found no undue influence in a suit to cancel a deed for fraud where the defendant was a frequent visitor and there was a confidential relationship.) ■ Or, as stated another way, the question of whether the presumption of undue influence has been rebutted is a question for the trier of fact and a reviewing court will not reverse if there is sufficient evidence to support a finding. (*Ginn* v. *Podesta* (1937), 8 Cal.2d 233, 235 [64 P.2d 1090] ; *Camperi* v. *Chiechi* (1955), 134 Cal.App.2d 485, 504 [286 P.2d 399].) ■ It would seem that the letter written by Miss Sinclair to Mr. Potstada in explanation of her actions, alone, would be sufficient credible evidence to support the finding.

■ Plaintiffs contend that in order to rebut the presumption of undue influence, it is necessary to show that Miss Sinclair had received independent advice in making the gifts to defendant and that she did not receive such advice. They contend that both Attorney Kin'dig and Attorney Potstada were really representing defendant and not Miss Sinclair. They cite *Webb* v. *Saunders* (1947), 79 Cal.App.2d 863, 869 [181 P.2d 43], and *Webb* v. *Saunders* (1949), 89 Cal.App.2d 732, 735 [201 P.2d 816]. There are two answers to this contention. One is that the evidence shows that at no time prior to the death of Miss Sinclair did Attorney Potstada represent defendant, and hence Miss Sinclair received independent advice from him, if not also from Attorney Kindig. Moreover, she was advised from time to time by other attorneys. ■ The second answer is that lack of independent legal advice, while an important factor in determining whether the presumption of undue influence from a confidential relationship has been overcome, and should be weighed by the trier of fact, is not an absolute essential. (*O'Neill* v. *Dennis, supra,* 109 Cal.App.

2d 210, 214; *Roeder* v. *Roeder*, 118 Cal.App.2d 572, 580 [258 P.2d 581].)

The evidence clearly shows that at all times Miss Sinclair knew what she was doing, that she had no relatives who had been close to her in any degree, that she regarded defendant as a sister, that because of the solicitude of Della and Attorney Cross for her she was convinced that they wanted to control her life and property, something she did not want them to do, that her determination to give all her property to defendant was not due to undue influence upon her by defendant, and that the presumption due to the confidential relationship was fully overcome.

Plaintiffs contend that the trial court's ''Announcement of Decision'' shows that it believed that no undue influence can be proved in any case unless weakness in mind of the grantor is shown. This, of course, is not the law. ''A person does not have to be mentally incompetent or even weak-minded to repose confidence in another when the relationship justifies it.'' (*Kloehn* v. *Prendiville*, 154 Cal.App.2d 156, 162 [316 P.2d 17].) However, the findings show that the court's decision was not based upon any such theory.

The findings control over any announcement of decision. (See *Formosa Corp.* v. *Rogers* (1951), 108 Cal.App.2d 397 [239 P.2d 88]; *Sketchley* v. *Lipkin* (1950), 99 Cal.App.2d 849 [222 P.2d 927].) Moreover, a reading of the announcement of decision does not support plaintiffs' contention. While the court did discuss unsoundness of mind, it must be remembered that one of the counts of the complaint upon which the court was required to find and did find, was unsoundness of mind.

2. *The Agreement.*

The agreement drawn by Attorney Kindig and executed October 9, 1952, by Miss Sinclair and defendant states that Miss Sinclair is about to assign to defendant in joint tenancy certain bank accounts, stocks, bonds and other properties ''for the purpose of paying and defraying the expenses of first party [Miss Sinclair] during the hospitalization of First Party and thereafter; AND WHEREAS, Second Party agrees to be her dutiful constant nurse and companion during the lifetime of First Party'' it is agreed ''that said Second Party shall conduct, maintain and preserve said funds, property and accounts to the use and benefit of said First Party so long as said First Party shall live, unless earlier terminated

in writing by said First Party.'' It then appoints Attorney Kindig as attorney in fact for both parties. Plaintiffs contend that this was a trust agreement wherein the property was transferred to both parties as trustees for the purposes therein stated with Miss Sinclair as the beneficiary and that upon her death the purposes were fulfilled and the corpus reverted to Miss Sinclair's estate as trustor. The agreement is ambiguous. It states that the purpose is to pay Miss Sinclair's expenses during hospitalization and thereafter. This is consistent with a trust theory. However, it next contains defendant's obligation to be Miss Sinclair's constant nurse and companion during Miss Sinclair's life. This is somewhat out of place in a trust agreement. Moreover, it seems to raise an inference that if defendant performed that obligation the property would go to her as joint tenant. The evidence clearly shows what was intended. As said by the trial judge, Honorable Richard R. Chamberlain: ''DID THE AGREEMENT OF OCTOBER 9, 1952, CREATE A TRUST THE PURPOSES OF WHICH HAVE BEEN FULFILLED, RESULTING IN AN OBLIGATION TO THE DEFENDANT TO RETURN ANY REMAINING ASSETS TO MISS SINCLAIR'S ESTATE?

''It would be an unnecessary elaboration of the Court's hereinabove summarized conclusions, to review the evidence bearing on the question just stated. Although Miss Sinclair by her voluntary acts placed her property either in the sole name of defendant or in the names of herself and defendant as joint tenants, she retained and exercised the power to draw checks on joint tenancy bank accounts until almost the date of her death; notwithstanding the Agreement expressed her purpose as that of paying and defraying her expenses during her hospitalization, the evidence shows that it was unnecessary for defendant to actually pay such expenses because Miss Sinclair herself attended to such payments up to three or four weeks before her death. And during the 18 months between the date of the Agreement and Miss Sinclair's death defendant continued 'to be her dutiful constant nurse and companion' as contemplated by the Agreement. It is apparent that Miss Sinclair fully understood that upon her death sole title to the property mentioned in the Agreement would vest in defendant as the surviving joint tenant.''

Moreover, assuming the instrument to be a trust agreement as contended by plaintiffs, the parties clearly rescinded it. It, of course, did not purport to apply to the real property, deed to which was given defendant some time before. Subsequently to its execution Miss Sinclair had the

money, stocks and bonds, with the exception of $30,000 above mentioned, taken out of joint tenancy and put in defendant's name solely. Thereafter she wrote the statement with copy to Potstada to the effect that she had transferred everything to defendant and giving the reasons; she also wrote that in April, 1953, she had given certain unnamed securities to defendant. On May 5, 1953, she wrote an assignment to defendant of all her bonds. Miss Sinclair's expressions and actions both before and after signing the agreement clearly show that the last thing she wanted was any of her property to go into her estate or to any of her relatives.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 18, 1959.